**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SAINT BERNARD PARISH GOVERNMENT | ) | |
| AND OTHER OWNERS OF REAL PROPERTY | ) | |
| IN SAINT BERNARD PARISH OR THE | ) | |
| LOWER NINTH WARD OF THE CITY OF | ) | |
| NEW ORLEANS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | No. 05-1119 L |
| v. | ) | |
| | ) | Honorable Susan G. Braden |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DIRECT TESTIMONY OF JEAN PRIEUR DU PLESSIS, CPE**

In accordance with the Court's pre-trial scheduling Order of October 21, 2013 (ECF No. 227), Defendant United States of America submits the following direct testimony by affidavit of Mr. Jean Prieur du Plessis, CPE.  Based upon the qualifications and experience of Mr. du Plessis, as detailed in his direct testimony and summarized in the *curriculum vitae* (marked as Defendant's Valuation Exhibit 47 ("DVX 47")), the United States requests that Mr. du Plessis be qualified as an expert in construction cost estimating.  The United States further moves for the admission of Mr. du Plessis' Expert Reports (DVX 23-48).

### Table of Contents

Summary of Opinions……………………………………………………………………3

Professional Experience……………………………………………………………..6

Cost Estimating Methodology………………………………………………………...12

Individual Property Assessments………………………………………………………...25

     1818 Center Street……………………………………………………………..25

     8600 Victory Drive……………………………………………………………35

     4119 E. Judge Perez…………………………………………………….......41

     3614-16 Fenelon Street…………………………………………………………44

     3024 Lakewood Drive……………………………………………………………47

     3209 E. Judge Perez…………………………………………………………...51

     6325 Paris Road………………………………………………………………55

     2414 Deslonde Street………………………………………………………59

Review and Validation………………………………………………………….....61

## Summary of Opinions

Q:      Please state your full name and business address.

A:      Jean Prieur du Plessis.  650 Poydras Street, Suite 1150 New Orleans, LA 70130-6101.

Q:      What is your occupation?

A:      I am a professional Cost Estimator.

Q:      Mr. du Plessis, before proceeding with the rest of your testimony, I would like for you to please provide a brief summary of the conclusions you have reached in this case.

A:      I was asked to develop estimates of the probable cost of repair at eight improved properties in St. Bernard Parish and the Lower Ninth Ward based on five flood scenarios (A1, A2, B1, B2, and C).  A summary of these flood scenarios is attached here as Exhibit A.

I was also asked to develop the probable cost of construction at three properties owned by St. Bernard Parish.  The following table summarizes my conclusions regarding the probable cost of construction or repair at these properties.

| Property | Scenario | Probable Cost of Repair |
|---|---|---|
| 1818 Center Street | Construction | $ 663,310.64 |
| | A1 | $ 233,935.25 |
| | B1/C | $ 226,467.16 |
| | A2/B2 | $ 203,906.03 |
| 8600 Victory Drive | Construction | $1,379,189.55 |
| | A1/B1 | $ 188,021.91 |
| | A2/B2/C | $ 179,510.54 |
| Fire Station #6 | Construction | $ 321,440.75 |
| | A1/B1/C | $ 169,949.75 |
| | A2 | $ 110,182.80 |
| | B2 | $ 100,104.10 |
| Tommaseo | A1 | $ 162,573.67 |
| | B1/C | $ 146,452.96 |
| | A2/B2 | $ 88,454.07 |
| Bordelon | A1/B1/C | $ 110,453.93 |
| | A2/B2 | $ 58,204.40 |
| Steve's RV | A1/B1/C | $ 254,812.65 |
| | A2/B2 | $ 96,444.85 |
| PSSI | A1/B1/C | $ 110,394.70 |
| | A2/B2 | $ 45,947.03 |
| Adams | A1/B1 | $ 148,379.43 |
| | A2/C | $ 137,493.88 |
| | B2 | $ 133,086.88 |



**Professional Experience**

Q:      I would like you to describe your background and qualifications now for the Court.  Did

you receive any higher education?

A:      Yes.  I received my civil engineering postsecondary degree from Technikon Pretoria in

1983 in South Africa.

Q:      Where are you employed?

A:      Madsen, Kneppers, and Associates ("MKA").

Q:      How long have you been employed at MKA?

A:      Approximately eight years.

Q:      Please describe MKA's work.

A:      MKA is a construction consulting firm.  We have 19 offices in the U.S. and Canada.  Our

professionals are Architects, Engineers, Cost Estimators, Construction Managers, and Roofing

Consultants, among others.  We provide a wide variety of services to clients worldwide.

Q:      What is your position at MKA?

A:      I am a Senior Cost Estimator.

Q:      What is cost estimating?

A:      Cost estimating is the predictive process of approximating how much a project will cost

to complete.  In construction cost estimating, the prediction is of the probable cost to repair or

build a particular structure, given a specific scope, time and location.

Q:      What does it mean for you to be a *Senior* Cost Estimator?

A:      I manage construction cost estimating projects within the office.  I also manage and

review the cost estimation work performed by others in our company.

Q:      Do you have a particular area of concentration in your work?

A:      My work includes the determination of repair scopes and the preparation of cost

estimates to remediate damage resulting from fire, flood, and wind, among other causes.  I have

provided cost estimating services with MKA for residential, commercial, and institutional

buildings.  My estimates have dealt with everything from hotels and casinos to single family

residences, to institutional buildings like schools, Universities, and hospitals.  Additionally, I

have prepared cost estimates for litigation concerning construction defects, wind/flood

apportionment, subrogation, and value disputes.

Q:      Where were you employed prior to MKA?

A:      Directly out of school, I was a site engineer and construction supervisor for six years with

Murray & Roberts in South Africa.  In that role, I supervised construction projects ranging from

residential construction to larger scale institutional facilities.

Q:      How did your work as a construction supervisor inform what you are doing now as a cost

estimator?

A:      As a construction manager, I was responsible for documenting the actual costs of

construction on a day to day basis and reconciling those costs with the original budget cost

estimates.  That experience has proved invaluable in my cost estimating work because I have

been on the actual implementation side of things to see how projected and actual costs compare.

Q:      What did you do after your time at Murray & Roberts?

A:      I then became a quantity surveyor with C.P. de Leeuw & Partners, where my focus was

on high-rise commercial construction cost estimating.

Q:       What is quantity surveying?

A:      It is the detailed quantification of construction scope and the estimated cost of all the

elements of a construction project.  In other words, once I have a general scope of work, I am

able to insert specific quantities and costs for that scope.  In South Africa, "quantity surveyor" is very similar to what a "cost estimator" is in the United States.

Q:      After your time at C.P. de Leeuw & Partners, what did you do?

A:      I was a Clerk of the Works, and Assistant Design Engineer at three civil engineering consulting firms in South Africa.  As a Clerk of Works, I represented owners to ensure that the contractors were performing in accordance with the contract in place, and as an Assistant Design Engineer, I assisted in structural design.

Q:      Did these jobs you are describing all involve reviewing cost estimates?

A:      Yes.  These all involved either reviewing or preparing cost estimates.

Q:      You temporarily left the construction industry in approximately 1985.  Is that right?

A:      Yes.  I temporarily left construction to pursue another career in the golf industry, but I returned to construction and cost estimating in approximately 2000, when I moved to the New Orleans Area.  When I first moved there, I managed my own "handyman" company, called Fine Design Homes.  Then, in 2002, I became a cost estimator and project manager at a company in Georgia called Architectural Concrete.  In that role, I developed cost estimates and bid proposals for architectural cast stone products, and managed the projects when bids were awarded to the company.

Q:      I know that you have been in the construction industry since the 1970s.  But how many years do you have in construction cost estimating?

A:      I have over 15 years of experience in construction cost estimating.

Q:      In the aftermath of Hurricane Katrina, did you work on any Hurricane Katrina-related cost estimate projects?

A:      Yes.

Q:      How many Hurricane Katrina-related cost estimates have you worked on since you have been with MKA?

A:      Hundreds in Louisiana and Mississippi.

Q:      Have those estimates included commercial, industrial and residential properties?

A:      Yes.

Q:      Can you please describe some of the Hurricane Katrina-related cost estimates you have been involved with?

A:      I was hired to prepare cost estimates for wind and flood damage at the University of Southern Mississippi on the Gulf Coast.  This was a fairly large-scale project involving estimates for repairing damage to dorms, classrooms, offices, gymnasiums, and other university buildings. I also prepared a cost estimate for hurricane-related damage repair at one of the casinos on the Biloxi coast.

Q:      How much was the total estimate for the casino project?

A:      The total estimate was approximately $140 million.

Q:      Do you apply the same set of principles when you are doing cost estimates on a small residential property as you do at a larger institutional or commercial property?

A:      The first principles are the same.  We base everything on labor, material element, and equipment costs.  Different considerations are involved in larger and smaller projects because larger projects benefit from economies of scale.  But, the methodology and basic principles are the same.

Q:      Are you a member of any professional organizations?

A:       Yes. I am a member of the American Society of Professional Estimators (the "ASPE").  I am also President of the local chapter of the ASPE.

Q:      What is the ASPE?

A:      The ASPE serves construction estimators by providing educational and professional

development opportunities.  The ASPE places great emphasis on ethics, standards and

certification.  The ASPE has the certification program that is considered the highest professional

recognition available to estimators.

Q:      Have you received that certification from the ASPE?

A:      Yes.   That is why I have the "CPE" or "Certified Professional Estimator" designation.

Q:      What did you have to demonstrate to obtain the CPE designation?

A:      I had to have at least 5 years of experience as a cost estimator.  I also had to take

approximately twelve hours of exams and submit a written paper.  To maintain my certification,

I am required to stay current with continuing education requirements.  I am also held to the

standards set out in the ASPE code of ethics.

Q:      What are those standards?

A:      There are a number of canons that govern professional cost estimating.  They are that

professional estimators shall:

- Perform services in areas of their discipline and competence;
- Continue to expand their professional capabilities through continuing education programs;
- Conduct themselves in a manner that will promote cooperation and good relations among members of our profession and those directly related to our profession;
- Safeguard and keep in confidence all knowledge of the business affairs and technical procedures of an employer or client;
- Conduct themselves with integrity at all times and not knowingly or willingly enter into agreements that violate the laws of the United States or of the states in which they practice;
- Establish guidelines for setting forth prices and receiving quotations that are fair and equitable to all parties; and
- Utilize their education, years of experience and acquired skills in the preparation of each estimate or assignment with full commitment to make each estimate or assignment as detailed and accurate as their talents and abilities allow.

They also require that professional estimators shall not:

- Engage in the practice of bid peddling;
- Enter into any agreement that may be considered acts of collusion or conspiracy; and
- Participate in acts such as giving or receiving of gifts, which are intended to be or may be construed as being acts of bribery.

I adhere to these ethical standards.

Q:      Were any of those standards particularly relevant in the work you did on this project?

A:      Yes.  I uphold all of these ethical standards in all of the work that I do.  In particular on this project, the requirement that a cost estimator perform services in the area of his discipline was directly applicable.  I specialize in evaluating construction cost to repair damage to structures, and that was what I was hired to do here.  When a subspeciality was required – such as cost estimates related to electrical work – I utilized the expertise of other individuals knowledgeable in the appropriate field.

Also, the obligation to ensure that my estimates are fair and equitable to all parties was particularly relevant in this case where we did not inspect these properties in 2005.  We set out at the beginning of this project the very clear guideline that, wherever there was uncertainty, we would give the landowner the benefit of the doubt.

And finally, the requirement that my estimates be as detailed and accurate as my abilities allow informed my approach in every cost estimate in this project.  I have endeavored to include as much detail as possible to ensure transparent, comprehensive estimates here.  I am confident that the level of detail we were able to include here resulted in bottom-line estimates that are fair and reasonable.  In this case, my cost estimates, in total, include approximately 10,000 line items.

Q:      Is your ASPE certification current?

A:      Yes.

Q:      You mentioned that you are President of the local chapter of the ASPE.  How did you

become President of the local chapter?

A:      I was elected President by other cost estimators.

Q:      Have you ever qualified in federal court to testify as an expert?

A:      Yes.  I was qualified as an expert in construction cost estimation in federal court in

*Armstrong v. United States* (*Armstrong*), No. 10-866 (E.D. La).  I testified at trial there about my

opinions of the probable cost to repair structures damaged by wind, rain, and flood during

Hurricane Katrina.  I provided the same type of testimony in that case that I have provided here.

Q:      Were any of those structures in St. Bernard Parish or the Lower Ninth Ward?

A:      Yes.  There were properties in both St. Bernard Parish and the Lower Ninth Ward at issue

in that case.

Q:      In *Armstrong*, did you follow the same methodology to estimate the cost of repair that

you followed here?

A:      Yes.

### Cost Estimating Methodology

Q:      I would like to turn to your specific work in this case now.  Please describe your

approach to construction cost estimating.

A:      I use the widely accepted first principles of quantity surveying and construction cost

estimating.  This means that I detail the tasks required for a construction project or repair project,

and then quantify those tasks according to a structure's specific dimensions.  My team and I

measure the overall structures according to the methodology of the American Institute of

Architecture's Document 101, which provides a standardized approach for measuring the areas

and volumes of buildings.  I then apply the fundamental principles of cost estimation by

estimating unit cost as an assembly of the cost of material, cost of equipment and cost of labor. This approach is fundamental and widely used in the construction cost estimating industry.

Q:      What was your instruction in connection with this case?

A:       I was asked to determine the probable costs of repair or replacement at eight improved properties in St. Bernard Parish and the lower Ninth Ward that sustained damage during Hurricane Katrina.  I was asked to determine these costs in several different flood scenarios.  The flood scenarios were included in reports provided by Mr. Jim Danner, P.E., of Denson Engineers, Inc., and I have attached those scenarios again here as Exhibit A.  I was also asked to develop complete construction cost estimates for three institutional properties owned by the St. Bernard Parish government.  These three construction cost estimates represent the probable cost to design and construct these improvements in August 2005, as if starting with a greenfield site.  Starting with a greenfield site is what I mean in my reports when I refer to the full construction cost estimates as starting "from scratch."

Q:      Before we proceed to talking about specific properties, I would like you to explain your general approach to your work in this case.  How did you approach the assignment?

A:      First, I conducted site inspections in April and May of 2013 with Nancy Lokocz, attorneys representing both Plaintiffs and the United States, and some of the other experts retained by the United States.

Q:      Who is Nancy Lokocz?

A:      Ms. Lokocz is an architect with our firm.

Q:      Can you please explain Ms. Lokocz' professional qualifications?

A:      Yes.  Ms. Lokocz is a registered architect with a Bachelors degree and Masters degree in Architecture from Tulane University.  She is a licensed architect in Louisiana, Idaho, Maine and

New Hampshire.  She has also taken specialized training in building science, roofing, and a number of related fields.  Her professional designation is "AIA", which means she is an Architect Member of the American Institute of Architects.  Ms. Lokocz has more than a decade of experience in the construction industry, and she and I have worked on a number of projects together.

Q:      Please describe what you and Ms. Lokocz did at the site inspections.

A:      Nancy and I took photographs, measurements and created sketches of the existing structures.  Wherever there were structures at our inspections, we applied the AIA approach to area and volume measurement as I mentioned earlier.

Q:      After the site inspections, what was the next step in your process?

A:      We then collected as much information as we could about what these properties looked like immediately prior to Katrina.  Based on that information, my team and I reconstructed floorplans of what the properties likely looked like when Hurricane Katrina hit.

Q:       Other than your physical inspections, what other information did you have about these properties?

A:      Our team reviewed all of the materials that the parties exchanged in discovery, which consisted of a large number of documents.  Our goal was to extract which of those documents and files had relevant information to the layouts and finishes of the buildings.

Q:      How did you go about reconstructing the floorplans?

A:      The floor plans are based on three elements: 1) the dimensions we were able to take at our physical inspections; 2) the documentary evidence we reviewed; and 3) reasonable assumptions about these types of structures based on our team's collective experience in cost estimation, architecture, and engineering.

Q:      Once you had the floorplans, what was your next step in developing your cost estimates?

A:      Mr. Danner provided scopes of work for each property for the five flooding scenarios.  I reviewed each of Mr. Danner's scopes of work to ensure that each appeared to be reasonable in light of the flood depths provided.  For example, if Mr. Danner stated that the water level was up to five or six feet, and then concluded that it would be necessary to replace eight feet of the drywall based on that flood level, I reviewed those conclusions to determine whether I thought they were reasonable.  I reviewed each of his conclusions and determined that they were, in fact, reasonable.  Where more than one flood scenario led to the same scope of repair on a given property, that is indicated in my repair estimate.  For the full construction cost estimates on the three institutional properties, I looked at each floorplan and developed an estimate for the cost of constructing each structure in its entirety, as if "from scratch," including any sidewalk.

Q:      What do you mean as if "from scratch"?

A:      I mean that the cost estimate is based on the assumption that we are starting with a greenfield.  The cost therefore includes site preparation and design, as well as the cost of actual construction.

Q:      Who actually drew these floorplans?

A:      Nancy Lokocz and John MacLeod.

Q:      You have already explained that Ms. Lokocz is an Architect with the firm.  Is Mr. MacLeod an architect?

A:      No.  Mr. MacLeod has a Bachelor of Science degree in engineering and has been working with MKA for five years.  He will sit for his exam to obtain his Professional Engineering license this Spring.  He also holds the title of Estimator, but he has not yet obtained

the certification that we discussed earlier – the Certified Professional Estimator or CPE

designation.

Q:      Did you work with anyone else on your team in developing the cost estimates?

A:      Yes.  I worked with Mr. Paul Christoferson.

Q:      What is Mr. Christoferson's profession?

A:      Mr. Christoferson is an Electrical Estimator with over 30 years of experience in the trade.

He is recognized as a Master Electrician.

Q:      What is a Master Electrician?

A:      A Master Electrician has mastered the capabilities of all positions within the trade.  This

title is recognized by the International Brotherhood of Electrical Workers (IBEW) as a

tradesperson in the electrical industry that has more than 10 years tenure as a journeyman

electrician and has passed through the career chain from apprentice to journeyman.  This

tradesperson has Supervisory and Foreman experience and has also exemplified skills in other

fields pertaining to the electrical industry such as engineering, calculations, contracting,

estimating, planning, drafting, troubleshooting, and inspecting.

Q:      What is a journeyman?

A:      A journeyman is a trained individual that performs labor for a particular type of

construction.

Q:      What was Mr. Christoferson's role in the project?

A:      Mr. Christoferson worked with me to implement Mr. Danner's scopes of work with

respect to the electrical components of the structures.

Q:      Did you review all of Mr. Christoferson's work to ensure that you considered it to be

reasonable?

A:      Yes.  I am ultimately responsible for all of the items in my reports, and determined that each electrical repair list was reasonable.

Q:      Is it typical for a construction cost estimator to rely on an electrical consultant?

A:      Yes.  While I have the general expertise to implement a scope of work with respect to electrical removal and replacement, an electrical consultant – especially a Master Electrician – is in the best position to ensure that the implementation of the scope of work is reasonable and accurate.

Q:      Other than Ms. Lokocz, Mr. MacLeod, and Mr. Christoferson, did anyone else assist you in preparing these cost estimates?

A:      Mr. Michael Bischof also assisted me with these cost estimates as an additional reviewer to ensure that I and my team had not missed anything, and to make sure that the overall cost estimates were reasonable.

Q:      Can you please describe Mr. Bischof's qualifications?

A:      Mr. Bischof is the Lead Cost Estimator with MKA with over 20 years of experience in building construction and property consulting.  He is also a Certified Professional Estimator with the C.P.E. designation I explained earlier, and has been with MKA since 1998.

Q:      Turning back to your process and the development of these floorplans.  Will the dimensions in your floor plans be exactly what the dimensions of each structure were immediately before Katrina?

A:      These drawings are approximations and provide a framework to make sure that our overall costs are adequate whole-project costs.  There are likely to be some differences between the drawings and what may have existed before, but these plans provide a solid framework for detailed cost estimating.

Q:      Once you had the floorplans, what was your next step in developing your cost estimates?

A:      I translated the general repairs that Mr. Danner refers to into a step by step, item by item, list.  I call this my "Chart of Accounts."  This is a list of all of the tasks/actions necessary to construct or perform repairs to the building.

Q:      How do you determine what items to list in your chart of accounts?

A:      In the best case scenario, I have either had the opportunity to inspect and measure the building to assess its components, or I have photographs of what existed there.  When I am lacking some of that information however, I am still able to make reasonable assumptions regarding implementation of the required scope.

Q:      Once you have your list of tasks necessary to repair the building, what do you do next?

A:      Then I quantify those tasks.  So, for example, if Mr. Danner has stated that the lower four feet of gypsum wall board need to be removed in a particular room, then I go to my floorplan of that room and, using the dimensions of that room, I determine how many square feet of gypsum wall board would need to be removed and replaced up to the four foot level.

Q:      Once you have the quantity required for a line item, what do you after that?

A:      For each line item, I also determine the appropriate unit cost.  A unit cost consists of a combination of material, equipment, and labor elements.  In this example we have been using, the unit cost for gypsum wallboard includes the material, which is gypsum wallboard, tape, mud and screws, expressed as a rate per square foot; and the labor cost, which includes the anticipated crew rate per hour multiplied by the expected output rate.  The expected output rate is the expected speed that the worker or crew will install the dry wall, expressed as a fraction of an hour.  There is no equipment cost in this particular example because gypsum wallboard is installed with typical tools, which cost is already included with the material and labor.

Q:      How do you determine what the cost of material is for a particular task?

A:      I draw on three basic sources of information: spreadsheets where I store cost information from previous projects; my experience and judgment as a cost estimator; and, where a material is unique and not something that I have worked with repeatedly, I look to external sources such as Home Depot or other websites reflecting material costs, or other contractors and colleagues that are routinely working with that material.

Q:      What do you mean by "spreadsheets where I store cost information from previous projects"?

A:      I keep spreadsheets with cost information from previous projects I have worked on at MKA to use as a guide.  I use them only as a starting point.  I review and may adjust certain items based on my experience, the local market, and how it fits into a particular project.

Q:      Should the unit cost information on those spreadsheets always match the unit cost information you have used in this project?

A:      No.  There may be some items that did not require adjustment, or only required minor adjustment, but generally some elements – whether material, labor, or equipment – may differ, making the unit cost different.  Each property is unique, and cost estimation requires a property-specific analysis.  At a property like the one at 3024 Lakewood Drive, for example, the front door is likely to be more expensive than the front doors that might be used in a lower-priced apartment complex.  The specific circumstances of each property will drive specific unit costs, and that is the type of information that cannot be drawn from the internet or any other external source, but rather requires consideration of the particular property at issue and the judgment of a qualified cost estimator.

Q:      Do contractors apply add-ons to material costs?

A:      Yes.  For example, a contractor may add the cost of waste or profit, tax, delivery costs, etc., as part of a material cost.

Q:      When you refer to profit incorporated as part of material cost, is that the same as your separate line item you list later in your reports for overhead and profit?

A:      No.  These are two different types of profit.  When we develop material, labor and equipment, we include the profit for the sub-contractor that would be installing the material in the unit cost itself.  Then, on the front page of the estimate, the overhead and profit listed as a separate line item is for the general contractor's profit, and the general contractor's office administrative costs (overhead).

Q:      You mentioned that, where material is unique, you look to external sources to find a starting place for cost.  In this case, were there any unique materials where you looked to external sources?

A:      Yes.  I looked to external sources to come up with material cost information for some of the athletic field site components.  For example, I looked at the kaypark.com website for the cost of bleachers.

Q:      You said that an additional element of cost for equipment would be involved if any *special* equipment is required.  I believe in the example of gypsum wallboard, you mentioned that its installation would not necessarily require that anything extra be added to unit cost for equipment.  Can you please explain when you add something to unit cost for equipment?

A:      For basic construction jobs, the contractor or subcontractor is assumed to keep certain tools in their toolbox.  However, in certain aspects of the project, in demolition for example, there may be an additional cost for a dumpster.  Or, if you are installing something high off the

ground, you may need to account for scaffolding, for example.  If your gypsum wallboard is high enough, there may be some equipment cost.

Q:     How did you develop your labor rates?

A:     I relied on information kept at our firm for what prevailing labor rates in the New Orleans area were around the time of Hurricane Katrina.

Q:     How does your firm develop the rates it considers to be "prevailing rates" in the New Orleans area?

A:     When we have multiple projects in an area, we typically have a few of the Senior Estimators collaborate to develop a list of current labor rates for journeymen found in the specific geographical location to be used in the development of repair and replacement cost estimates.  To develop that list, they start by talking with the New Orleans office about the actual rates we were seeing in the area.  Then, they look at websites such as salary.com and Davis Bacon Wage by State.  Other points of reference are Engineering News Record, RSMeans, and Saylor to mention a few.  Once they have obtained a current base wage rate for the area, they compile them on a spreadsheet in order of trade.  The estimators then add the following "burden" items: workers compensation insurance, FICA, Medicare, federal unemployment, state unemployment, and other benefits such as holiday pay, vacation pay, 401(k), and medical.  The base rate plus burden equals the total estimated cost to the contractor or sub-contractor employing that trade.  For subcontractors, they then add some amount for subcontractor overhead and profit, and then round up to the nearest whole number to be used as the average crew rate for that trade.

Q:     What do you mean by "average crew rate"?

A:     For example, a crew is made up of a supervisor, a journeyman, and maybe two laborers. The "average crew rate" is the average of those individuals' rates expressed as an average rate per hour.  There may be a different average crew rate for different trades.  For example, a carpentry crew may have a different rate than a painting crew.

Q:     Did you have a list to use with average crew rates in this case?

A:     Yes.  After Hurricane Katrina, a list of average crew rates was developed by engaging in the process I just described and was emailed around the office for use as a reference.  This was based on the actual prevailing rates for construction and repair in the New Orleans area right after the storm.  I used those rates as a guide for this project.

Q:     Did you adjust those rates at all?

A:     I adjust all of my labor rates based on the specifics of each project.  Many of the average crew rates in that list were still relevant for pre-Katrina prices.  Like other aspects of cost estimation, assessment of labor rates requires consideration of the individual property at issue.

Q:     You have explained how you quantify each of your line items, and how you estimate material, equipment and labor for each unit cost.  Once you have quantified each of your line items and determined the unit costs, what do you do next?

A:     I calculate the total hard cost by extending the calculation, or multiplying quantity times rate.

Q:     What do you mean by "hard cost"?

A:     Hard costs are the construction costs directly related to the repair scope, which includes labor, material and equipment, but excludes the general contractor's markups (general conditions, overhead and profit, insurance, bonds, permits, and consultant fees).

Q:     Do you do those calculations manually?

A:      No, our company's proprietary software program does the calculations.  It has the

formulas already built in.

Q:      Does your company's software contain information about the unit cost of an item?

A:      No.  The software does not contain any unit cost information.  It organizes, formats, and

does the necessary multiplication and addition, but it does not dictate any particular quantity or

cost information.

Q:      Once you have your hard costs totaled, what do you do next?

A:      I add in "soft costs," which are additional costs that do not refer to actual building

components, but rather refer to administrative costs.  The soft costs in my reports are General

Conditions, which include costs for supervision, temporary toilets, an office trailer, temporary

electricity, additional dumpsters, etc.; insurance; overhead (the costs incurred at the corporate

office of a contractor) and profit (of the general contractor), permit fees; and the cost of

consultants (who would develop the design and construction drawings for submission to the City

or Parish for permitting).

Q:      Will each cost estimate have components that are a carbon copy of exactly how the

structure was pre-Katrina?

A:      Not necessarily.  In estimating the cost to repair a home, I estimate the cost to repair it

with materials of like kind and quality, but that does not mean that it will always be the mirror

image of what was there before, even if we have complete information.  For example, I am

thinking of the Adams property.  The Adams property was fairly old when Hurricane Katrina hit,

and, as I understand it, did not have central air conditioning.  In replacing that property in 2005

however, very few homeowners in Louisiana in 2005 would have foregone the opportunity to

install central air conditioning if they were already doing major repair work.  As such, our repair

cost included central air conditioning, even though that was not a mirror image of exactly what was there.  What is important is that the repair cost estimate reflects enough value to repair a particular structure and return that structure to its pre-storm condition.

### Individual Trial Property Assessments

### StBP#1: 1818 Center Street

Q:      I would like you to walk us through how you apply this process to the individual

properties now.  Please start by describing the property at StBP#1: 1818 Center Street.

A:      This property had some ball fields, two brick

structures, and a concession kiosk on it (known as the

"Witch's Hut" because its roof is in the shape of a witch's

hat).  If you look at page 72 of Exhibit ("Ex.") 1 to my

1818 Center Street Construction Cost report (DVX 24),

you will see a picture of the community buildings


MKA000177

(Buildings 1 and 2) on October 5, 2005.  On page 73, you

will see the Witch's Hut ("concession kiosk" or Building 3)

on October 5, 2005.  I inspected this property on May 1

2013 and all three buildings were still on the property.


MKA000145

Buildings 1 and 2 had been gutted, but they had not been

repaired.  We were not able to access the Witch's Hut during the

inspection because it was locked, so I am not sure whether that

building had been gutted, and I do not know what its interior



layout was.  We were also provided some general descriptions

of the buildings in a letter from Cooper and Kirk, dated March

27, 2013 (DVX 147).

Q:      Why is it important for you to access the inside of buildings at an inspection?

A:      As you see in the narrative at the beginning of Ex. 1 to my report for this property, the

purpose of my evaluation was to prepare an opinion of the probable cost of designing and

constructing the facility located at 1818 Center Street, in 2005, immediately prior to Hurricane

Katrina, using contemporary materials of like kind and quality.   To determine contemporary

materials of like kind and quality, I look at all of the information available about what existed on

August 29, 2005, immediately prior to the storm.   I need to find out what kinds of finishes were

in the buildings to reconstruct them.   I need to know the kind and quality of the finishes to apply

that to my cost estimate.   The more information I have about the finishes, plumbing fixtures,

cabinetry in the kitchen, finishes in the bathroom etc., the more precise I can be about pricing the

different elements in the buildings.

Q:      Why is it important for you to know what the buildings had been used for?

A:      Knowing what a building was used for helps a cost estimator draw reasonable

conclusions about the layout of that building.   For example, how many bathrooms it would have

had; and, within those bathrooms, how many bathroom fixtures would have been required.

Q:      What do you mean by "finishes"?

A:      The "finishes" are the non-structural parts of a building.   For example, floor finishes

include carpeting, vinyl flooring, ceramic tile, wood flooring, or concrete.   The wood framed

walls in a building are generally finished with some type of base board trim near the bottom

which also varies in quality.   Walls are covered with drywall in most cases (also referred to as

gypsum wall board or "GWB").   The gypsum wallboard is then painted, painted and textured, or

covered with some other wall covering like wallpaper or ceramic tile.   Ceilings can vary as well.

The most common ceiling finishes are acoustic ceiling tile or drywall.   Kitchen finishes may

include kitchen cabinetry, etc.  All of this detail helps to determine the estimated cost to return a

structure to its pre-damaged state, with materials of like kind and quality.

Q:      Were you able to see the finishes in Buildings 1 and 2 when you inspected those

buildings?

A:      No.  I was able to see the framing

and the general structural layout of those

buildings, but they had been gutted and the

finishes removed.  We reviewed any

information provided and made reasonable

assumptions as to what the finishes may be

for a building like this.  The next step was



MKA000184

to draw a floorplan of each of the three buildings at this property.

Q:      Once you had the floorplans of the structures, please walk us through the next step in

your process.

A:      Once I had the floor plan, I divided the property into areas and locations.  If you look at

page 20 of Exhibit 1 to my 1818 Center Street – Construction Cost Estimate report (DVX 24),

you will see my list of areas and locations.  For example, Area 206 is the interior of Building

number 1.  Within that area, there are 13 locations.  If you look at page 18, the floorplan, you can

see those locations within Building 1.



Q:      For a building like the Witch's Hut where you were not provided access to the interior, how did you determine what locations to put inside of that building?

A:      A general description of the building was provided in the Cooper & Kirk letter (DVX 147).  Since we did not have any photographs of the interior of that building, we used some information from the letter, but also looked at where the doors were and made reasonable assumptions about what a concession stand like that would have had inside.  I gave Plaintiffs the benefit of the doubt and put in two bathrooms, a concession area, and two storage areas with the necessary fixtures.



MKA000174

Q:      Once you had identified the areas and locations, what did you do next?

A:      As I explained earlier, for each structure, I used what I refer to as a "chart of accounts".  This is a list of all of the tasks necessary to construct, or perform, repairs to the building.  So, for example, staying with the Witch's Hut, if you look at page 52 of Exhibit 1 to my report (DVX 24), you will see a description of the steps necessary to build the interior of the concessions area within the kiosk (location number 1 within area number 406).  For example, item no. 12.0105, you would need to install cabinets.

Q:      How did you determine what to use in the Witch's Hut?

A:      While I do not know for certain that there were cabinets in that location, a concession kiosk will generally have some type of shelving.  Giving Plaintiffs the benefit of the doubt, I included these cabinets in the concession kiosk. While I do not know how many cabinets might

have been there or exactly what those cabinets looked like, I relied on my experience of what is likely to be the appropriate quantity and quality.

Q:      Once you have your chart of accounts, please describe for us how you came up with your unit costs for each item listed in the chart of accounts.

A:      Each unit cost reflects the cost of material, labor, and equipment.  Looking at item number 12.0117 in the Witch's Hut, the unit there is "linear foot" (LF), the quantity is 6, and the unit cost is $123.01.  That unit cost reflects $103.01 for the cost of material and $20.00 for labor. This particular item does not require any equipment cost because its installation is generally done with basic tools.

Q:      Once you have come up with your unit cost figures, how do you determine how many units are appropriate for a given item?

A:      This is where I use quantity surveying, as I described earlier.  That is the process of taking the dimensions of a structure, the list of items, and quantifying how many units of each item is required for each location.

Q:      Once you had the total "hard costs" estimate for constructing all of the areas and locations at 1818 Center Street, what did you do next?

A:      I added in the soft costs, as discussed earlier.

Q:       I would like to move to discussing the repair cost estimates at 1818 Center Street now under the various flooding scenarios.  What is your understanding of those flooding scenarios?

A:      I understand that Mr. Danner was provided a series of depths at each property for each flood scenario, and that he then provided the scopes of work for what he determined would have been necessary to repair a building if a particular level of flooding had been present at a particular property.  I was provided the flood depth information in Mr. Danner's reports so that I

could confirm that Mr. Danner's scopes of work were reasonable based on the flood depths provided.  I conducted that review and found Mr. Danner's scopes of work to be reasonable.

As an example, the following lists all of the tasks necessary to perform the repairs of one location within one building (Building 2) at 1818 Center Street under Scenario A1.  The table contains several columns with detailed descriptions.  Reading from left to right, the table shows the chart of account number, a description of the work to be completed, the unit of measure, the quantity, the unit cost, and the total hard cost for that line item.  Our software adds those items as a total for that location.  My reports contain similar tables for each location for each building to be repaired under each of the different scenarios.



**Madsen, Kneppers & Associates, Inc.**
Construction Consultants & Engineers

### StBP #1 - 1818 Center Street
### Area - Location - Item Report

**Estimate**      Water Damage Repair Cost Estimate (A1)
**Building Desc.** Multi Use Public Facility                                    **Prepared By**   JPD / NDL

| CSI No. | Description | Unit | Qty | Unit Cost | Total Hard Cost |
|---|---|---|---|---|---|
| **Area No. 306 - Building 2 - Interior** | | | | | |
| **Location No. 1 - Room 1  (Area No. 306)** | | | | | |
| 02.1209 | Remove & Dispose 6' Window Sill | EA | 2.00 | $6.75 | $13.50 |
| 02.1381 | Remove & Dispose Fiberglass Batt Insulation - Ceiling | SF | 153.00 | $0.27 | $41.31 |
| 02.1425 | Remove & Dispose Interior Door with Frame | EA | 1.00 | $23.75 | $23.75 |
| 02.1509 | Remove & Dispose Vinyl Flooring | SF | 153.00 | $0.52 | $79.56 |
| 02.1513 | Remove & Dispose Wood Base | LF | 55.00 | $0.27 | $14.85 |
| 02.1529 | Remove & Dispose Gyp Board Walls | SF | 440.00 | $0.33 | $145.20 |
| 02.1533 | Remove & Dispose Gyp Board Ceiling | SF | 153.00 | $0.43 | $65.79 |
| 06.2016 | Install 4" Wood Base Board With 1/4 Round | LF | 55.00 | $2.32 | $127.60 |
| 06.2141 | Install Window Sill | EA | 2.00 | $47.47 | $94.94 |
| 06.2229 | Install Wood Trim at Doors & Windows | LF | 34.00 | $2.44 | $82.96 |
| 07.2011 | Install Fiberglass Batt Insulation in Ceiling | SF | 153.00 | $1.01 | $154.53 |
| 07.9005 | Install Caulking | LF | 62.00 | $1.89 | $117.18 |
| 08.2005 | Install Pre-Hung Interior Door & Frame | EA | 1.00 | $217.94 | $217.94 |
| 08.7061 | Install Interior Door Hardware | EA | 1.00 | $132.74 | $132.74 |
| 09.2065 | Install 5/8" Gyp Board on Wall - Tape & Float | SF | 440.00 | $1.79 | $787.60 |
| 09.2073 | Install 5/8" Gyp Board on Ceiling - Tape & Float | SF | 153.00 | $1.93 | $295.29 |
| 09.7013 | Install 12" x 12" Vinyl Composite Floor Tiles | SF | 153.00 | $2.72 | $416.16 |
| 09.8029 | Prime & Paint GWB Walls | SF | 440.00 | $1.13 | $497.20 |
| 09.8041 | Prime & Paint 4" Wood Base & 1/4 Round | LF | 55.00 | $1.04 | $57.20 |
| 09.8061 | Prime & Paint GWB Ceilings | SF | 153.00 | $1.25 | $191.25 |
| 09.8093 | Prime & Paint Door Frame | EA | 1.00 | $31.01 | $31.01 |
| 09.8097 | Prime & Paint Door Both Sides | EA | 1.00 | $41.82 | $41.82 |
| 09.8161 | Prime & Paint Window Sill | LF | 2.00 | $1.30 | $2.60 |
| 09.8193 | Prime & Paint Door Trim | LF | 17.00 | $0.87 | $14.79 |
| 16.8024 | Install 12" Drum Flourescent Fixt | EA | 2.00 | $54.92 | $109.84 |
| 16.9505 | Install 3 Way SWITCH Assembly | EA | 1.00 | $89.28 | $89.28 |
| 16.9521 | Install RECEP DUPLEX WM Assembly | EA | 2.00 | $81.45 | $162.90 |
| 16.9531 | Install Light Fixture J Box Assembly | EA | 2.00 | $41.43 | $82.86 |
| | Total for Location No. 1 | | | | $4,091.65 |
| **Location No. 2 - Hall  (Area No. 306)** | | | | | |
| 02.1381 | Remove & Dispose Fiberglass Batt Insulation - Ceiling | SF | 46.00 | $0.27 | $12.42 |

Q:      Please briefly summarize the opinions you reached about the probable cost to repair this property under the five scenarios.

A:      The probable cost of repair of 1818 Center Street in the A1 scenario was $233,935.25. The probable cost of repair in the B1 and C scenarios was $226,467.16.  The probable cost of repair in the A2 and B2 scenarios was $203,906.03.



Q:      Do these probable cost figures include both hard costs and soft costs as you defined above?

A:      Yes.

Q:      Mr. Danner's report for 1818 Center Street says that, in the A1 scenario, assuming that approximately 9 ¼ feet of water was above the floor in the Witch's Hut, the resulting damage required removal and replacement of grade-mounted HVAC equipment; hot water heaters; all wall, ceiling and non-ceramic floor coverings; electrical wiring; outlets and lighting fixtures; thermal insulation; and cabinetry and woodwork.  Please explain to me how you implemented that scope of work to determine that the probable cost of repair in A1 was $ 233,935.25.

A:      First, look at page 49 of my A1 report for 1818 Center Street (part of Exhibit 1 to my report) (DVX 25).  At the bottom of that page, you will see that I have a zero line item for the "substructure" to the concession kiosk (Area No. 402).  This means that the A1 flooding would not have damaged the foundation of that building, so there was no flood related damage to the substructure.  Then, moving to the exterior wall framing (Area No. 403, Location No. 1), from Mr. Danner's scope, I understand that there would not have been any exterior wall framing damage, nor would there have been any damage to the roof structure (Area No. 404, Location No. 1).  However, there likely would have been the need to clean and encapsulate the interior wall framing (Area No. 403, Location No. 2), so I have included a line item for that.

Moving to the exterior of the concession kiosk, replacement of the exterior door would have been necessary.  According to Mr. Danner, since all wall, ceiling and non-ceramic floor coverings would have needed to be replaced, I listed each of the components related to wall, ceiling and non-ceramic floor coverings in both demolition and replacement.  For example, fiberglass batt insulation is removed at 02.1381 and replaced at 07.2011.  The gyp board walls are removed at 02.1529 and replaced at 09.2065; the gyp board ceiling at 02.1533 and 09.2073, and the vinyl flooring at 02.1509 and 09.7013.  For cabinetry and woodwork, look, for example, at item 02.1673.  In that line item, 29 linear feet of cabinets are removed and disposed of.  They are then replaced at 12.0105.

For electrical wiring, I have included 48 hours for an electrician to remove and dispose of all necessary damaged electric wiring, devices and equipment in all three buildings.  *See* DVX 25 at 10.  16.1254 through 16.4299 list all electrical components that would need to be installed as replacement for what was removed.  *See* DVX 25 at 55.  The hot water heater is reinstalled at

15.1321, and six hours of plumbing material and handling is included to cover the cost of removal and clean-up. *Id.*

By adding up these various elements, I was able to arrive at a total repair cost for A1. I conducted a similar analysis of the other scenarios, and thereby calculated repair costs for Scenarios A1, A2, B1, B2, and C.

### StBP#2: 8600 Victory Drive

Q:    Now I would like to turn to StBP#2: 8600 Victory Drive, Chalmette, LA. Can you please describe this property?

A:    There were two buildings at this property. The first was a prefabricated steel structure on a concrete slab on grade foundation. The perimeter had a painted concrete masonry block wall 8 feet high. The exterior walls above the concrete masonry units ("CMU") were furnished with corrugated metal panels, and the roof was corrugated metal. The walls and ceilings were insulated with vinyl-backed insulation. The exterior doors were metal with metal frames, and there were no exterior windows. Portions of the upper walls were clad with corrugated translucent fiberglass panels. The walls also had louvered vents.



MKA000675



MKA000390

Inside the gymnasium, there was a concessions area, two work rooms, a men's bathroom, a women's bathroom, halls to the entry and second floor, stairs, and a main gym area that was being used as a race track when we inspected the site.  On the second floor there were storage rooms and a viewing room to observe the race track on the floor below.



MKA000442

The majority of the interior walls on the first floor were painted CMU and the second floor walls were wood framed with painted drywall finish.  The ceiling at the concessions room was acoustical tile and the other interior ceilings were typically finished with painted drywall. The flooring was vinyl composite tile (VCT) at the concessions and work rooms and painted concrete elsewhere.

The building had minimal plumbing.  The bathrooms had typical fixtures and accessories.  The main race track room had space heaters and wall louvers for ventilation.  A central HVAC unit was installed for the smaller spaces.



MKA000497

The second building had been demolished prior to our visit.  Based on the review of documents in the case and of the remaining concessions slab, the concessions stand adjacent to the main building was a single story wood framed and CMU structure on a concrete slab on grade foundation.  The wood framed roof had large overhangs.  The roofing was comprised of composition shingles, and the windows were single pane horizontal sliding units.

36

Q:      In your full construction cost estimate, did you include costs associated with the ball

fields or any other site improvements?

A:      Yes.  My estimate includes chain link fencing; wood framed dug-out shelters for the ball

fields; a baseball backstop; aluminum bleachers; and grass seeding.

Q:      To develop your construction cost estimate, did you use the same approach that you

described earlier in developing your construction cost estimate at 1818 Center Street?

A:      Yes.  My team and I inspected the site. When we conducted our inspection, it appeared

that the gym was in use.  The electricity was on, and it looked like it was being used as a remote

control miniature car racing facility.  We used the AIA method to measure the buildings' areas as

described above.

We then reviewed all of the available documentation exchanged by the parties in this

litigation, along with satellite photos and roof reports.  Based on the inspection and

documentation, we drew floorplans of these buildings.

After we had the floorplans, I developed areas and locations, as described earlier.  Then, I

filled in the list of tasks necessary to construct each area and location (the "chart of accounts" I

referred to earlier).  Once I had my chart of accounts, I quantified each task.  I then determined

the appropriate unit cost for each line item by adding material, labor, and equipment.  I

multiplied the unit cost times the quantity for each line item to get my total hard costs figure, and

then added all of the soft costs I discussed earlier.





Q:      Please briefly summarize the opinions you reached about the probable cost to repair 8600 Victory Dr. under the five scenarios.

A:      The probable cost to repair the improvements at 8600 Victory Drive in the A1 and B1 scenarios was $ 188,021.91.  The probable cost to repair these improvements in the A2, B2, and C scenarios was $ 179,510.54.



Q:      Why did you include the cost of remote control racing track in your estimate?

A:      I try to use materials of like kind and quality in each of my estimates.  However, my ultimate goal is to make sure there is enough money in the estimate to cover the cost of construction and repair, using materials of like kind and quality.  The descriptions I had of what the gym at 8600 Victory looked like immediately before Hurricane Katrina were general.  If I had used the barebones descriptions of basketball courts, my estimate could have been too low. Instead, I made the judgment call to give Plaintiffs the benefit of the doubt.  As a reasonable approach for that estimate, I used what was actually there on the date of the inspection.

Similarly, at that property, Plaintiffs' description in their letter dated March 27, 2013, stated that the gymnasium was 3,000 square feet in size.  That is only 25% of what the actual size of that gym was based on my own measurements during our site inspection.  The documents were simply inadequate reliance materials if used without applying some cost estimating judgment.  I made the judgment call that the pre-Katrina information we had been provided for this building was not very reliable, and that using the actual elements of the building present at our inspection provided a more fair and reasonable approach for estimating the costs of construction and repair.

### STB#5: 4119 E. Judge Perez

Q:      Now I would like to turn to StBP#5: 4119 E. Judge Perez.  Can you please describe this property?

A:      The building was single story CMU structure on a slab on grade. The low slope roof appeared to be torch down or similar asphaltic built up roof system with metal flashings and a parapet fascia.  The interior was separated into a truck bay area and a crew living area. The living area included a communication room, captain's office, hall, kitchen, shower room, lounge/bunk room, mechanical room, and generator room.  The interior walls were likely finished with painted gypsum wallboard and framed with wood studs.  The ceilings were acoustical tile in the crew living area.  The floors were reportedly vinyl composite tile in the crew living area.  The bathroom fixtures, electrical and climate control elements were typical for this type of building.

Q:      How did you approach developing the probable cost of construction and repair at the Fire Station?

A:      The same way I approached the other properties, as described earlier.  We reviewed all available information. We then drew a floorplan of the building and designated areas and

locations.  I then developed a chart of accounts for what tasks would be necessary to construct

the Fire Station.  I quantified those tasks, and then developed a unit cost based on material, labor,

and equipment.  I multiplied the unit cost times the quantity to get total hard costs, and then

added the soft costs as described earlier.

Q:      Was the pre-Katrina structure still present at your inspection?

A:      No.  There was a brand new Fire Station at 4119 E. Judge Perez.

Q:      What opinion did you reach regarding the probable cost of construction at Fire Station

#6?

A:      The probable cost to construct Fire Station #6 from scratch was $ 321,440.75.

Q:      Please briefly summarize the opinions you reached about the probable cost to repair Fire

Station #6 under the five scenarios.

A:      The probable cost to repair these improvements in the A1, B1, and C scenarios was

$169,949.75.  The probable cost to repair these improvements in the A2 scenario was

$110,182.80.  The probable cost to repair these improvements in the B2 scenario was

$100,104.10.





**4119 E JUDGE PEREZ**

FIRST FLOOR PLAN

### 3614-16 Fenelon Street

Q:      I would like to move to discussing 3614-16 Fenelon Street.  Can you please describe that

property?

A:      The building was a single story

wood framed structure on a slab on grade

foundation. The exterior walls were finished

with brick veneer.  The steeply pitched hip

and gable roof was covered with

composition shingles on wood sheathing.



MKA000840

The building was comprised of two apartments. The interior

walls were finished with painted gypsum wallboard and

framed with wood studs.  The ceilings were painted gypsum

wallboard. The floors were carpet, vinyl, and tile.  The

bathroom fixtures, electrical and climate control elements

were typical for a residence.



MKA000965



MKA000795

Q:      Was the pre-Katrina structure still present at your

inspection?

A:      Yes.  The pre-Katrina residence was still there and

had been repaired.

Q:      Was the building in use?

A:      Both units at 3614-16 Fenelon were occupied at the time of our inspection.

Q:      How did you approach developing the probable cost of construction and repair at 3614-

16 Fenelon?

A:      The same way I approached the other properties, as described earlier.  We inspected the property and reviewed all available information. We then drew a floorplan of the building and designated areas and locations.  I then developed a chart of accounts for what tasks would be necessary to repair 3614-16 Fenelon St. under the five scenarios.  I quantified those tasks, and then developed a unit cost based on material, labor and equipment.  I multiplied the unit cost times the quantity to get total hard costs, and then added the soft costs as described earlier.

Q:      Please briefly summarize the opinions you reached about the probable cost to repair 3614-16 Fenelon St. under the five scenarios.

A:      The probable cost to repair these improvements in the A1 scenario was $ 162,573.67.  The probable cost to repair these improvements in the B1 and C scenarios was $ 146,452.96.  The probable cost to repair these improvements in the A2 and B2 scenarios was $ 88,454.07.





**3614 & 3616 FENELON**
FIRST FLOOR PLAN

**3024 Lakewood Drive**

Q:      I would like to turn now to 3024 Lakewood Drive. Please describe the improvements at this property

A:      The building was a two story wood framed structure, founded on a slab on grade. The exterior walls were finished with brick veneer. The steeply pitched hip and gable roof was covered with composition shingles on wood sheathing.  The first floor had an entryway, a living room, dining room, laundry room, kitchen, bathroom, and breakfast room.  The second floor had three bedrooms with closets, two bathrooms, a hall, and a linen closet. The interior walls were finished with painted gypsum wallboard and framed with wood studs. The ceilings were painted gypsum wallboard. The floors were finished with wood, tile, carpet, and sheet vinyl. The bathroom fixtures, electrical and climate control elements were typical for a residence.



MKA000971



MKA001122



MKA001060

Q:      Was the pre-Katrina residence still there at the time of your inspection?

A:      Yes, but it had been repaired.

Q:      Was the residence in use at the time of your inspection?

A:      Yes, as a single family residence.

Q:      Please briefly summarize the opinions you reached about the probable cost to repair 3024

Lakewood Dr. under the five scenarios.

A:      The probable cost to repair these improvements in the A1, B1 and C scenarios was

$110,453.93.  The probable cost to repair these improvements in the A2 and B2 scenarios was

$58,204.40.





3024 LAKEWOOD

FIRST FLOOR PLAN



GENERAL NOTES

1. THE SKETCH IS PROVIDED FOR IDENTIFICATION AND/OR CONCEPTUAL PURPOSES ONLY AND IT IS NOT INTENDED FOR CONSTRUCTION.

2. ALL DIMENSIONS, LOCATIONS AND ELEVATIONS ARE APPROXIMATE.

Madsen, Kneppers & Associates, Inc
Construction Consultants & Engineers

**3024 LAKEWOOD**
SECOND FLOOR PLAN

| PROJECT NO: | SCALE: |
| 2013.0675 | NTS |
| DRAWN BY: | REVIEWED BY: |
| JAM | NDL |
| DATE: | SHEET NO: |
| 8-9-13 | PLAN |

## 3209 E. Judge Perez

Q:      I would like to turn now to 3209 E. Judge Perez. Please describe the improvements at this property.

A:      The site had two buildings. Both appeared to be of similar construction, but the building closest to E. Judge Perez (Building 1) was larger. The building was single story prefabricated steel building on a slab on grade foundation.  The exterior walls and roof were finished with corrugated metal siding and roofing.  The interior walls in the offices and showroom were finished with painted gypsum wallboard and framed with metal studs.  The ceilings were acoustic ceiling tile. The floors were vinyl throughout.





MKA001176

        In the Service/Garage Areas, the corrugated exterior metal walls were insulated with foil backed batt insulation.  The service garage also had a wood framed, wood finished interior bathroom facility.  The bathroom fixtures, electrical and climate control elements were typical for a business of this type.



MKA001475

Q:      Were the pre-Katrina structures still present at the time of your inspection?

A:      Yes, but they had been repaired.

Q:      Were the buildings in use at the time of your

inspection?

A:      They appeared to be in use of some sort.

There was some office equipment in one of the

rooms of the front building.  But, it did not appear

to be in use as a mobile home repair and sales shop.

We were not able to access the back building at

Steve's RV because it was locked at the time of our

inspection.





Q:      Please briefly summarize the opinions you reached about the probable cost to repair 3209

E. Judge Perez Dr. under the five scenarios.

A:      The probable cost to repair these improvements in the A1, B1, and C scenarios was

$254,812.65.  The probable cost to repair these improvements in A2 and B2 was $ 96,444.85.



Q:      Mr. Danner did not include removal of bathroom fixtures in his scope of repair here for

Scenario A1, yet you remove those fixtures.  Why?

A:      Mr. Danner's scopes of work are general and based on civil engineering analysis.

Bathroom fixtures may not be destroyed by floodwaters.  However, I exercise my construction

industry judgment as to whether implementing that scope of work would require removal of

other components.  Where an entire wall is going to be removed, or other significant construction

activities undertaken, especially in a small space, a contractor will often need to remove

additional fixtures that are susceptible to construction damage.  At Steve's RV, for example, I

include the cost of removing and disposing of the water closet (which is a toilet).  That is

because of the extent of the first floor damage in Scenarios A1, B1, and C.



BLDG. 1

BLDG. 2

GENERAL NOTES

1. THE SKETCH IS PROVIDED FOR IDENTIFICATION AND/OR CONCEPTUAL PURPOSES ONLY AND IT IS NOT INTENDED FOR CONSTRUCTION.

2. ALL DIMENSIONS, LOCATIONS AND ELEVATIONS ARE APPROXIMATE.

MKA
Madsen, Kneppers & Associates, Inc.
Construction Consultants & Engineers

3209 EAST JUDGE PEREZ DR.
BLDG. 1 & BLDG. 2 - FLOOR PLAN

| | |
|---|---|
| PROJECT NO.: 2013.0675 | SCALE: NTS |
| DRAWN BY: JAM | REVIEWED BY: NDL |
| DATE: 8-9-13 | SHEET NO.: PLAN |

1 **6325 Paris Road**

2 Q:      I would like to turn now to 6325 Paris

3 Road.  Please describe the improvements at this

4 property.



MKA000074

5 A:      There were two buildings at Paris Road:

6 a boat shop of approximately 3805 square feet,

7 and a storage building of approximately 3750

8 square feet.  The boat shop was a prefabricated

9 steel structure with metal siding and roofing. The steel structure was constructed on concrete

10 footings. The exterior walls and roof were finished with corrugated metal siding.  The interior of

11 the building was unfinished.  Two storage areas

12 and a bathroom were constructed of wood

13 framing with composite wood sheathing at the

14 south end of the building.  The building was

15 open to the exterior at the north elevation and

16 did not have HVAC except for a window unit at

17 one of the wood framed rooms. The electrical



MKA000088

18 system included high voltage wiring for equipment.

19        The storage building was a prefabricated steel structure with metal siding and roofing.

20 The steel structure was constructed on a concrete slab on grade.  The exterior walls and roof

21 were finished with corrugated metal siding.  The front (south) elevation had two metal roll up

22 doors.

23 Q:      Were the pre-Katrina structures still present at the time of your inspection?

1  A:      The front building was still present and had

2  been repaired.  The back building was completely

3  new.  It is my understanding that that building had

4  been completely destroyed and had been rebuilt.

5  Q:      Were the buildings in use at the time of your

6  inspection?



MKA000053

7  A:      Both buildings at 6325 Paris Road looked like they were in use.  The front building

8  looked like it was being used as storage, and the back building or boat shop was being used as a

9  boat shop.

10  Q:      Please briefly summarize the opinions you reached about the probable cost to repair 6325

11  Paris Rd. under the five scenarios.

12  A:      The probable cost to repair these improvements in the A1, B1, and C scenarios was

13  $110,394.70.  The probable cost to repair these improvements in the A2 and B2 scenarios was

14  $45,947.03.





**BLDG. 1- FIRST FLOOR**

**BLDG. 1- SECOND FLOOR**

GENERAL NOTES

1. THE SKETCH IS PROVIDED FOR IDENTIFICATION AND/OR CONCEPTUAL PURPOSES ONLY AND IT IS NOT INTENDED FOR CONSTRUCTION.

2. ALL DIMENSIONS, LOCATIONS AND ELEVATIONS ARE APPROXIMATE.

Madsen, Kneppers & Associates, Inc
Construction Consultants & Engineers

**6325 PARIS RD.**
BLDG. 1 FLOOR PLANS

| PROJECT NO. | 2013.6675 | SCALE | NTS |
|---|---|---|---|
| DRAWN BY | JAM | REVIEWED BY | NDL |
| DATE | 8-9-13 | SHEET NO. | PLAN |



**BLDG. 2- FIRST FLOOR**

LOC 3- OFFICE
A: 130 SF
P: 44 LF

LOC 4- BATH
A: 42 SF
P: 26 LF

LOC 5- BATH
A: 42 SF
P: 26 LF

LOC 1- OPEN AREA
A: 3,467 SF
P: 199 LF

LOC 2- KITCHEN
A: 196 SF
P: 56 LF

STEEL COLUMN
(TYP.)

14' x 16' ROLL-UP
DOOR (TYP.)

GENERAL NOTES

1. THIS SKETCH IS PROVIDED FOR
IDENTIFICATION AND/OR
CONCEPTUAL PURPOSES ONLY AND
IT IS NOT INTENDED FOR
CONSTRUCTION.

2. ALL DIMENSIONS, LOCATIONS AND
ELEVATIONS ARE APPROXIMATE.

MKA  Madsen, Kneppers & Associates, Inc
Construction Consultants & Engineers

**6325 PARIS RD.**
BLDG. #2 FLOOR PLAN

| PROJECT NO: 2013.0673 | SCALE: NTS |
| DRAWN BY: JAM | REVIEWED BY: NDL |
| DATE: 8-9-13 | SHEET NO: PLAN |

EXHIBIT 7

58

## 2414 Deslonde Street

Q:      I would like to turn now to 2414 Deslonde Street.  Please describe the improvements at this property.

A:      The building was a two story wood framed structure on masonry piers. The exterior walls were finished with painted wood lap siding.  The roof was covered with asphalt shingles on wood sheathing. There were exterior mounted gutters and downspouts to discharge rain water. Vinyl awnings have been installed over windows and at the front entry.  The first floor had an entry, living room, kitchen, bathroom, stairway, closets, and two bedrooms.  The second floor had a master bedroom and closet.  The interior walls were finished with painted gypsum wallboard and framed with wood studs. The ceilings were painted gypsum wallboard. The floors include wood, carpet, and vinyl.



**FIRST FLOOR PLAN**

**SECOND FLOOR PLAN**

GENERAL NOTES

1. THE SKETCH IS PROVIDED FOR IDENTIFICATION AND/OR CONCEPTUAL PURPOSES ONLY AND IT IS NOT INTENDED FOR CONSTRUCTION.

2. ALL DIMENSIONS, LOCATIONS AND ELEVATIONS ARE APPROXIMATE.

Madsen, Kneppers & Associates, Inc.
Construction Consultants & Engineers

**2414 DESLONDE**
FIRST & SECOND FLOOR PLAN

| PROJECT NO: | 2013.0675 | SCALE: | NTS |
| DRAWN BY: | JAM | REVIEWED BY: | NDL |
| DATE: | 8-9-13 | SHEET NO: | PLAN |

Q:      Please briefly summarize the opinions you reached about the probable cost to repair 2414 Deslonde St. under the five scenarios.

A:      The probable cost to repair these improvements in the A1 and B1 scenarios was $148,379.43.  The probable cost to repair these improvements in the A2 and C scenarios was $137,493.88.  The probable cost to repair these improvements in the B2 scenario is $133,086.88.



Q:      Will your "remove and dispose" line items always match your "install" line items in quantity?

A:      Not always.  Your remove and dispose may be more general.  For example, you remove and dispose a door with its hardware intact.  When you go back to installation, you may be installing the hardware and the door, which will be two separate line items.

### Review and Validation

Q:      How do you know that your estimates are reasonable?

A:      I have completed a number of review processes on these cost estimates.  These review

processes included my own room by room analysis; my building by building analysis; my

"whole property" analysis; a cross-check review by Mr. Michael Bischof, CPE (second most

senior estimator after our company's President); and a line by line item double-check to fix any

typographical errors in my reports.

Q:      I would like to discuss each of those review processes with you in more depth.  Please

first describe what you mean by a "room by room," "building by building", and "whole

property" analysis.

A:      Best practices in individualized cost estimation require a great level of detail up front.  To

ensure that the estimate is going to be comprehensive enough, detailed, and individualized, line

items are included.  In this case, my cost estimates, in total, include approximately 10,000 line

items.  Ultimately however, the purpose is for the estimate to reflect a reasonable and probable

cost for the overall project, based on what has been established to be the scope of work.  This is

true in both flood damage repair and in full construction cost estimating.  I am confident that my

construction cost and repair cost estimates here are reasonable and reflect just that: the probable

cost to perform the work.  To ensure that I am not losing sight of the big picture, once all of my

line items are completed, I look at each room in each building and ask myself:  would this be an

adequate amount of money and time to repair this kitchen?  Did I allow enough for a particular

trade to perform the work?  I conduct that analysis for each trade, each room, each building, and

each overall property.

Q:      Please describe what you mean by a cross-check review by Mr. Bischof to ensure

reasonableness in unit cost as well as overall cost.

A:      At the end of each cost estimate, there are different ways to look at the total cost.  One

way is what I described above:  by looking at the total cost of each room and each building and

each property.  Another way is to cross-check big-ticket items in my reports with independent

sources of cost data.  In this case, Mr. Bischof looked at the highest cost ticket items in my

estimates and checked them against unit cost figures in an RS Means reference book for large

properties in 2005 in the New Orleans Metropolitan area.

Q:      What is RS Means?

A:      RS Means is a commercial database of construction cost data.

Q:      Do you generally use RS Means in your estimating work?

A:      No – I do not.

Q:      Why not?

A:      I find that this generalized cost data is generally not as reflective of actual cost as the

individualized approach.

Q:      Why is that?

A:      In my experience, generalized databases do not necessarily consider site specific

conditions, nor do they factor in the extent of scope of a specific project.  Both site specific

conditions and project size are critical to an accurate cost estimate.

Q:      Can you please provide an example of what you mean by a "site specific condition"?

A:      Every construction project is a custom job.  There are no two projects that are exactly the

same.  Site specific conditions include everything from the ease of access to a particular building

to the quality of finishes in a particular structure.  Even houses in the same subdivision or across

the street from one another may have different construction costs.

Q:      If it is not as reflective of actual cost as the individualized approach, then why did you use it for a cross-check?

A:      None of the commercial databases are as reliable as detailed estimates, but using this RS Means was a good, independent means for cross-checking unit costs.  I would expect my numbers to be higher than the rates in this particular database, and they were.

Q:      Why would you expect your numbers to be higher?

A:      This RS Means book pricing is for projects above $1 million and generally for new build construction.  The projects in this case were smaller in scale and therefore generally required higher per unit cost for material and labor output.

Q:      What were the results of that check and the trends you are referring to?

A:      In this case, we had a range of property types:  from residential to commercial and institutional.  The RS Means data is most appropriate for large projects of over $1 million.  8600 Victory Drive is closest to that scale, and my numbers were 14% higher, on average, than the RS Means numbers.  The unit costs from this RS Means data should be closest to 8600 Victory, and furthest from the smaller residential prices.  That trend was what we found.

Q:      What does that tell you?

A:      That tells me that my numbers are reasonable and that a contractor would have been willing to do the work for my estimated amount.  I would expect an individualized estimate that takes into account the specific attributes of a building to be more precise and often a bit higher than the generalized databases are.  Plus, I can tell from working with gypsum wall board for many years in New Orleans that the price listed in RS Means for gypsum wall board was extremely low for the New Orleans area.  My unit costs for that item are much more representative of actual costs.

Q:      What about for the other properties?  Did you check those numbers against RS Means?

A:      Yes.  Unit costs at Fenelon were 30% higher on average than the RS Means data; unit costs in my estimate for the Fire Station were 18% higher on average; unit costs in my Steve's RV estimate were 23% higher on average; unit costs in my 1818 Center Street estimate were 23% higher on average; unit costs in my Bordelon estimate were 21% higher on average; unit costs in my 6325 Paris Road estimate were 27% higher on average; and unit costs in my Adams estimate were 30% higher on average.

Q:      What did this data tell you about the accuracy of those cost estimates?

A:      Again that my cost estimates are reasonable and reflective of the probable cost to perform the work.  I expected the smaller residential properties to come in with higher unit costs than the RS Means data for larger projects.  This exercise also confirmed that I gave Plaintiffs the benefit of the doubt in cost.

Q:      What do you mean "gave them the benefit of the doubt"?

A:      Where we were not allowed to enter a building, or had no photographs of a pre-Katrina structure, I did not assume low-quality finishes and an empty building.  Instead, because my estimates used higher unit costs than the RS Means data, my analysis gave Plaintiffs the benefit of the doubt regarding cost.

Q:      You say that the RS Means was a method available for an independent check of your cost items.  Did you also check your unit cost figures against the receipts provided by Plaintiffs in this case?

A:      No, I did not.

Q:      Why not?

A:      Because they were not relevant to my project.  Those receipts were incomplete and did

not provide the whole picture of the repair job; they were from after Hurricane Katrina, not

before; they may have been for finishes or fixtures that did not even exist prior to the Hurricane;

and we had no way to know whether they were representative of actual cost or some specific

arrangement with a contractor, etc.  Basically, they were not reliable, and not helpful to

determining a total reasonable repair cost estimate.

Q:      You have described your room by room analysis; your building by building analysis;

your "whole property" analysis; and the cross-check review conducted by Mr. Bischof. What

was the "line by line item" double-checking you completed?

A:      At my deposition, Plaintiffs identified some typographical errors in my reports.  They

also identified differences that were not typographical errors, but rather were deliberate

differences based on the different scopes of work required for different levels of repair.  In these

reports there were approximately 10,000 individual cost items. Within those cost items, there

were even more variables, since each cost item consists of material, equipment, and labor, as

well as the take-off and quantification of the scope.  The benefit of the individualized cost

approach is that my detail provides a much greater level of reliability and transparency than

using a generalized database.  My approach is specifically tailored and I stand by it as the best

approach to construction cost estimating.  In the interest of making sure that there was no

confusion about these typographical errors, and, most importantly, to make sure that the valid

differences in scope here were not overshadowed by typos, I went back through each of my

construction cost estimates and flood repair reports, and I put together an errata sheet to describe

what corrections could be made to my reports.  I assured my client in that letter that I would not

recommend re-issuing any of my reports.  The exercise of a line by line check only increased my

confidence in my original bottom-line numbers.  Here, none of my estimates would have

changed by more than 5.2%, and 14 out of 23 of them would have changed by less than 1%.

Q:      Please explain an example of one of these typographical errors.

A:      For example, at 1818 Center Street, I had inadvertently left in a demolition cost that

would have allowed for removal and disposal of 20 doors in all scenarios.  That entry should

have been 16, not 20.  Although the total amount of money in that demolition budget was not

wrong, it was based on an estimate for my mis-entered number of doors, so I recalculated the

estimate based on the more-accurate quantity of 16.

Q:      Now that you have done this line item by line item review again, are you confident that

there are no other entry errors in your reports?

A:      I am confident that my bottom-line cost estimate figures are fair and reasonable.  These

bottom-line figures represent the probable cost of repair and reconstruction for these properties.

However, I cannot ever say that an entry error won't be identified in over 30,000 inputs.  But, I

assure you that changes in individual entries do not undermine the reliability of my overall cost

numbers.  My overall cost figures reflect the dollar amount that the work could be executed for.

My goal in doing my work is to always reflect what would happen in the real world of

construction.

Q:      Are you familiar with FEMA project worksheets?

A:      Generally, yes.

Q:      How, if at all, did you use the FEMA project worksheets in this case?

A:      My team and I reviewed the FEMA project worksheets, but we did not rely on them

heavily.

Q:      Why not just rely on the building descriptions and damage descriptions provided by

FEMA?

A:      Without knowing more about the FEMA assessments, I could not consider them reliable.

They were conducted after Hurricane Katrina, not before; there is very little information about

what approach was used in their cost estimates; and these assessments were conducted for

different purposes – sometimes for the purpose of obligating 100% of a replacement cost for a

building, and sometimes including costs to improve that building.  I understand that the initial

estimates set forth in these reports were usually quickly prepared in order to make funding

available as quickly as possible to the St. Bernard Parish, without the benefit of a thorough

analysis like the one I prepared.

Plus, these assessments were for all Hurricane Katrina damage, not just flood damage.

As I understand it, FEMA approved 100% funding for Hurricane Katrina damage and would pay

for replacements even where repairs could have been done.  These assessments were conducted

by different individuals with different measurements, conclusions, approaches, etc., and we

simply do not know enough about their methodology to know whether it would be appropriately

adopted in this case.

We considered this information; we just did not accept it at face value.  For drawing our

floorplans, we relied more heavily on our actual inspections, on photographs, and on reasonable

conclusions about what should normally be present in a building of a particular type.  For our

scopes of work, we relied on Mr. Danner.  For quantifying our scopes of work, we applied the

principles of quantity surveying based on the floor-plans we had developed.  And, for developing

unit costs, we relied on our knowledge of prevailing costs in this market and applied the

fundamental principles of cost estimation by aggregating the cost of material, labor and equipment for each and every task.

Our cost estimates are based on the best information available, well-documented and based on industry standards of cost estimating.  Where a difference exists between our cost estimates and the figures set forth in these other documents, I believe our estimates are more reasonable.

Q:      How do you know, at the end of the day, that your cost estimates are reliable?

A:      As part of my daily routine, I interact with many vendors, suppliers, and contractors in and around New Orleans to determine what the market will bear so that my judgment reflects a practical application of the work to be accomplished.  I also routinely compare my cost estimates to the bids contractors submit to perform the same scope of work for a particular project.  My cost estimates are consistently and reliably reflective of actual project construction costs.

Pursuant to 28 U.S.C. 1746, I, Jean Prieur Du Plessis, certify under penalty of perjury that the above testimony is true and correct.

Dated: 11 · 13 · 2013

Jean Prieur Du Plessis

**EXHIBIT A - Scenario Descriptions**

| Scenario | MRGO Status | Marsh Status | Levee Breaches | Description |
|---|---|---|---|---|
| A1 (*Katrina Actual Event Conditions*) | 2005 pre-Katrina dimensions | 2005 pre-Katrina conditions | Breaching occurring as during Katrina | Base case: Actual Katrina Hindcast |
| A2 (*2005 MRGO/ 2005 Wetlands/ IHNC Breaches Only*) | 2005 pre-Katrina dimensions | 2005 pre-Katrina conditions | IHNC Breaches Only | Base case reflecting levee breaches only in the IHNC floodwall |
| B1 (*MRGO As-Designed/1956 Wetlands*) | MRGO at its authorized dimensions as of completion in 1968 | 1956 Wetland conditions | Breaching occurring as during Katrina | Katrina impact absent bank erosion channel widening/ wetland degradation |
| B2 (*MRGO As-Designed/1956 Wetlands/IHNC Breaches Only*) | MRGO at its authorized dimensions as of completion in 1968 | 1956 Wetland conditions | IHNC Breaches Only | Katrina impact absent bank erosion channel widening/ wetland degradation reflecting INHC breaches only |
| C (*No MRGO/ 1956 Wetlands*) | No MRGO | 1956 Wetland conditions | Breaching occurring as during Katrina | Katrina impact without MRGO, and with 1956 wetland topography |
| D (*No Federal Levees/2005 MRGO/2005 Wetlands*) | 2005 pre-Katrina dimensions | 2005 pre-Katrina conditions | No levees along MRGO Reach 1 and 2 | Katrina impact with MRGO but without levees along MRGO. MRGO and wetlands with 2005 conditions |
| E (*No Federal Levees/No MRGO/1956 Wetlands*) | No MRGO | 1956 Wetland conditions | No levees along MRGO Reach 1 and 2 | Katrina impact with no federal influence |